The Trafficking Victims Protection Act was enacted in 2000 to address a very serious problem of domestic and international violence, essentially, and that's the problem of sex trafficking and human slavery. The Congressional findings that are cited in Mr. Bell's brief, I think, may not constitute controlling authority on any of the issues that Mr. Bell is raising, but I think they do illustrate the very serious problem that that act was passed to really address. One thing that you don't find in the Congressional findings accompanying the Trafficking Victims Protection Act is anything relating to a single pimp traveling from hotel to hotel with three adult prostitutes and advertising themselves on Backpage.com. Nevertheless, Johnelle Bell is sitting in a federal prison serving a 30-year prison sentence because he happened to pass through a district in which that kind of activity was prosecuted as sex trafficking. Judge Goldberg Counsel, doesn't it, the real gravamen here is whether or not there were threats or physical force that held at least one or two of these ladies against their will to perform for the defendant? Mr. Bell Yes, Your Honor, that's exactly right. Now, when I get to the Division V, I think the Congressional findings are appropriate for another reason, I think, because they do illustrate the gross, well, the length of the defendant's sentence is grossly disproportionate to the seriousness of the offense. But with respect to the sufficiency issue, despite the fact that we do mention the Congressional findings in our brief, we are looking at the face of 18 U.S.C. 1591 to determine whether all the elements of the offense are established, and that's our argument under Division I. Judge Goldberg Well, if the testimony of the victims who were his associates, if you want to use that term, if they're to be believed or if their testimony is counted as credible, which we are essentially required to do at this level, wouldn't there be sufficient evidence? Mr. Bell Of course, the standard is very high for this Court, for us to challenge the sufficiency of the evidence, that's true. I think the testimony of the victims, the so-called victims, may establish part of that element, but not the entirety of the element. It's not enough that the government established that there were threats, that there was threats of force, that there was coercion, force, all those things. It's not enough that the government established that. The government must also establish that the commercial sex acts that these women engaged in were the products of the threats of force, coercion, all of the 1591 factors. It's not only that, but not only must the government prove that, the government must also prove that the defendant did what he did, knowing or acting in reckless disregard for the fact that threats of force, coercion and fraud would be used to entice these women to engage in commercial sex acts, and I think the evidence is grievously short of proving that, and that's really our argument in Division 1. Granted, the government did put on evidence of the relationship between Mr. Bell and these women. The government did put on evidence showing that these women came from very tragic backgrounds, at least one of them suffered from mental illness. The government put on evidence describing the relationship between Mr. Bell and these women, and the relationship was, to some extent, very controlling. There were aberrational testimony about violence, but the bottom line really is, even if there was threats, even if there was force, even if there was coercion, did these things cause the women to engage in the commercial sex acts? And the answer to this question is no. And the proof and the pudding are the most telling. If you have credible testimony of threats, wouldn't it be up to the jury to resolve whether those threats were what caused their compliance with his desire? Well, the question in resolving a sufficiency claim is whether or not any rational finder of fact could find beyond reasonable doubt the other. Well, couldn't a reasonable jury conclude, based on him telling, I'll hurt your family, I'll hurt members of your family, that that's a sufficient basis for making a conclusion, if you believe the witness, that you complied with his demands because of concern for the safety of your family? Well, it's our position that looking at the entire record, which the court does in resolving sufficiency claims, no reasonable jury could reach that conclusion. We don't just look at the evidence supporting conviction. We look at the entire record to make that determination. And the fact of the matter is... But we do resolve inferences in favor of the jury's verdict. Well, you do. That's correct, Your Honor. But in view of the fact that, again, I think the most telling piece of evidence in this case is the fact that every single one of these women, except possibly Sabra Addison, which is addressed in another division of my brief, every single one of these women were free to leave when they wanted to leave. They were free to come back when they wanted to come back. They did leave when they wanted to leave. They did come back when they wanted to come back. There's no question about that. When these women left him, and when they weren't with him, they would engage in prostitution when they weren't with him, without exception. These women went out and either by themselves or with other pimps would go out and engage in prostitution. And then if the ones that wanted to come back returned to him. Even after the whole operation was over, after June 18th, each one of these women went out and engaged in prostitution after that. And one of them made efforts to contact him again to try to have herself brought back into the fold. Under those circumstances, it's our position that no rational finder of fact could find the entirety of that element. That Mr. Bell did what he did, knowing or acting in disregard for the fact that threats of coercion or fraud resulted in their engaging in commercial sex acts. That's our position in Division I. Do you want to switch to another division? Yes. On the sentence, you said you'll come back to the findings when you get to the sentence. Yes. And I see that the pre-sentence report set forth your contention at length that in essence you're saying if there was sufficient evidence here the case was overcharged because this is not what Congress had in mind. I take that to be. Or maybe I'm misstating it. Close. All right. Well, what did Judge Gritzner say to that? Because it was all laid out for him at length and he did vary downward to some extent. Can you refresh my memory what he said about this argument? I think Judge Gritzner basically said we're foreclosed by Eighth Circuit case law and that's basically all he had to say about the Eighth Circuit argument. The Eighth Amendment argument. No, I mean, I gather you were also arguing though just that in his discretion under the statute he should impose a lesser sentence and that, of course, could avoid any constitutional problem. So he must have concluded, you're saying under Eighth Circuit precedent, that there would be no constitutional problem. But what did he say as to why he exercised his discretion to impose 360 versus something less? I can't off the top of my head tell you the exact reason. There was a specific reason why he chose to vary down from, I think, the guideline sentence in this case, I believe was life, and the judge varied down to 360 months. Did not resolve the Eighth Amendment argument in our favor and just very quickly, very quickly, the case law is against us. And that was as much as he had to say about the Eighth Amendment issue. And on appeal, you're advancing an Eighth Amendment argument. Yes. That the 360 is constitutional. And are you advancing an argument under reasonableness review or is it strictly a constitutional? Strictly constitutional proportionality review. And essentially, that's where the arguments are going to come into play most significantly in this case. I'm not saying under that division, necessarily, that Mr. Bell was overcharged. I think probably that's implicit in the other arguments I'm making in this appeal. But with respect to the Eighth Amendment argument, it starts off with an assumption that under the elements of 18 U.S.C. 1591, assuming that all the elements are established, then nevertheless, the sentence that was imposed in this particular case was constitutionally disproportionate because of the fact that if you look at the congressional findings, you look at what Congress intended to prohibit when they enacted 1591, as I said at the outset, nothing in there about a single pimp with three adult prostitutes. They talk about people that engage in massive international and domestic human slavery schemes and sex trafficking schemes, many of them involving children and things like that. Nothing about this type of an offense. What's your best case on this point from the Supreme Court? Would it be Harmelin? I mean, Harmelin I know comes out against the defendant, but it talks about the motive analysis. Is there any better case? Well, there's nothing better than that, factually, unfortunately. How would we go about saying what is the maximum allowed by the Eighth Amendment if we adopted your approach? Because how do we know whether it would be 300 or 240? Well, I'm looking at this particular case and in this particular case, the best possible sentence permissible under the Eighth Amendment would be 15 years. Okay, how do you get that? Simply proportionality analysis. Number one, you look at how this behavior would be punished under state law, which is substantially less. That's set out in my brief, this sort of pandering, pimping and everything. He might be looking at a five-year indeterminate prison sentence in the state of Iowa for doing what he did in this case. So you think 180 months is the maximum allowed by the Eighth Amendment? Well, it's the maximum allowed by the Eighth Amendment because it's the minimum statutory sentence. Well, that doesn't necessarily mean it's constitutional. I thought you were giving us constitutional theory that would trump any statute. As applied in this case, and I guess if I'm making an as applied argument, I have to look at the statutory minimum. Well, the statutory maximum is life. Right, and the statutory minimum is 15 years. The court could not go below 15 years. Well, it could if it was unconstitutionally disproportionate. Right, I mean the court could say even 15 years is unconstitutional, I'm only going to give him 10 because that's all he'd get in Iowa. And I would be happy to see that. No, I'm trying to understand the rationale. My rationale is looking at the congressional findings that accompanied 18 U.S.C. 1591, it spoke to something much more serious than what the defendant did. Congress prescribed a sentencing range of 15 years to life. If we're going to punish what Mr. Bell was doing under 1591, this has got to fall at the very bottom of the continuum. This has got to be at the very low range of sentencing for this particular offense. That's my analysis. If the range is 15 years to life and Mr. Bell is not involved in trafficking children and kidnapping people in Venezuela and bringing them to the United States and selling them into slavery, if all he's doing is traveling from state to state with three women, three adult women, if they're going to punish him along that continuum the 8th Amendment basically would scream that the very bottom of the statutory range is what should be opposed in this case. Is there another federal statute that would apply here to the interstate activity? Well, the other charged offenses. Yeah, so you're saying you could have left off. Could have left off. I'm not saying that, but I could say that. What would be the sentence under the other? Yeah, of course, under the other statutes, I guess he got a 15-year sentence, so if it's excessive under the, oh, he got a 30-year sentence. If it's excessive for the sex trafficking offense it's excessive for the Interstate Transportation Convention as well. But did the judge give him 30 years concurrent on the other? Yes. Because that would seem to, if he gave him 30 years even without regard to the international statute. I can't tell you off the top of my head whether he took that approach. Then that would, then how, doesn't that undercut your Well, I'm not arguing that, I'm not arguing that it would be I'm arguing that a 30-year sentence is excessive. I'm not arguing that a 15, under these circumstances, I'm not arguing that a 15-year sentence would necessarily be excessive because he didn't get a 15-year sentence. By the way, he got 180 months on counts 2 and 3. And 240 months on counts 4, 5, 6, and 7. 60 on count 8 and 120 on 9, 10, 11, and 12. All to be served concurrently. I guess if it weren't for count 1, he would have had 240. Yes. Maximum 240. But you think that would be unconstitutional to give him 240 on the other count? Under those circumstances, I would be looking at whatever statutory minimums were involved in those cases. And then under those circumstances, we might be talking under those circumstances about what sentence might pass constitutional muster. My argument is based, I raise the congressional findings that accompany 1591. My argument is really based on that. It would be a different argument if he wasn't convicted under 1591. There may be no argument at all. That would be something we would address under those circumstances. Thank you. And very briefly, I'm going to talk about also Division 3, which is a newly released document. It was released three months after the trial was over. The name Tiffany Addison was nothing but really a name that was used in the discovery. Tiffany Addison was not called by the government as a witness. There was nothing in the discovery to indicate that she had any information or anything that would be helpful to either party, including the defendant. Three months after trial, we're given information that she exists, that she has something to say. We send our investigator to talk to her. I talk to her. And basically, that's when we discover what she would have testified to if she had been contacted. It's our position that no amount of diligence would have resulted in bringing her to testify at trial. There was absolutely no reason based on the information that had been provided by the government or even the information that was available to the government at the time of trial to indicate that any level of diligence would have resulted in her being brought to testify at trial. Her testimony, if she was allowed to testify, would not be simply impeaching, would not be simply cumulative. I talked about the evidence... What would she have provided? She would have indicated that Saber Addison knew prior to coming into this organization what kind of organization it was that she actually may have been... Isn't that impeaching? And its purpose is to negate the testimony of a government witness about her involvement? It could be the central issue of contested fact in this case if, in fact, the jury, which it very well may have done, would have hung its hat on Saber Addison's testimony. Saber Addison was the only witness who testified at this trial who was involved in the organization who was not in the organization long enough for us to actually have information regarding her ability to walk away and return to the organization any time she wanted to because she's only there for eight days. The only evidence we have of that, basically, is the fact that the three of them were allowed to leave and go to the shopping mall the day they were actually arrested. We don't have that kind of evidence. If we would have had Tiffany Addison's testimony at the time of trial, it would have gone directly to really what may have been the central contested issue of fact in this case, which was Saber Addison's willingness or lack of willingness to be part of this organization. So is it the fact that you didn't have access to Tiffany before trial or that you didn't know there was a Tiffany before trial? We knew that Tiffany Addison existed. That was it. We didn't have access to her. We had no way to contact her. Because there's nothing in the discovery to indicate that she would have any relevant information. Well, Counselor, you're in your rebuttal. You can continue if you like. I think I'll reserve the rest of my time for rebuttal, Your Honor. Mr. Romero? Your Honors, Mr. Burns, first I'll respond to some of the things brought up by Mr. Burns, and then there's a couple of points that I would like to make to the Court, if I may. First of all, the characterization throughout by the defense has been that this is really not a big deal because this is just a pimp hauling three adult females as prostitutes across the country. That's not accurate. The record that was made, and Count 1 bears this out, the record that was presented was that there were five or six co-conspirators, two of whom were immediately involved in the cell that were taken out in Omaha, Nebraska, and they were traveling from the East Coast to the Rocky Mountains. So this is a potentially much larger operation than is suggested. But even if it was just that, I think it misses the intent of what this statute is about. I think the government clearly presented a case that three women were forced to engage in certain specific commercial sex acts by forced fraud or coercion, and it's actually force, threat of force, fraud, coercion, or any combination thereof, because this defendant sought them out, groomed them, and preyed upon them. He became intimately knowledgeable of each one of his victims, and he used the vulnerabilities of those victims to cause them to commit sex acts that they might not otherwise have committed. So what was the evidence that the threats or the force or the coercion caused them to engage in the commercial sex acts? And not just desire for income? I think it's very clear that, for example, with regard to Jennifer Levnick, there was a significant grooming period with regard to an individual that he knew was in a psychiatric hospital, and he induced her to think, with significant evidence at trial, that she had a real hole in her life with regard to a male figure and love, that he loved her, that she would, quote, be his first and his last, that they would have children together, that all the money she would make him would ultimately be theirs to build their future, all of those things being knowingly and patently false. So did she say at any point that that's why I then engaged in the commercial sex acts? Several times, Your Honor. It's in the record several times, that not only that she did that, but that's a significant part of why she came back. And that's borne out even more by the fact, and this is actually evidence that was produced by the defense, months after she was rescued in Omaha, Nebraska, she actually tried to have contact with the defendant still because she cared for him. But what we know in the record is that from November of 2010 to January of 2011, the defendant engaged in a rapid succession of claimed romantic relationships with Jennifer Levnick, Courtney Mayberry, and then Brittany Lawson, who he made his bottom bitch or the managing prostitute. Is psychological effect like you're describing within the meaning of coercion under the statute? I think, Your Honor, it's both. It's strictly within the meaning of coercion under the definition of serious harm in 1591E4. It specifically says psychological and other. It also specifically refers to the background of the victim. That's a very broad concept. That takes you back to what's the history of the victim. So that's 1594, I'm sorry, 1591E4, serious harm. But isn't coercion separately defined? It is, Your Honor, but it plays off the definition of serious harm. Serious harm is part of the definition of coercion. Yes. Coercion means threats of serious harm, and you're saying serious harm means psychological harm. Or any. It lists financial, for example, but in this case. You're saying a threat to cause psychological harm is coercion. Yes, and also if you look at the definition of force, and the government has never claimed that anything is other than given in instruction number 20, but the definition of force, which tracks much of the case law, the term force means any form of power, violence, or physical pressure directed against another person. Physical is specifically limited to defining pressure. Then the definition goes on to say, as the jury was instructed, power means dominance, control, or influence. So the term force includes any form of dominance, control, or influence. Is that a statutory definition, or where is that definition coming from? It comes from a number of cases, a number of which are cited in the government's brief, Your Honor. Well, is force in the statute? I'm just trying to understand. Yes, Your Honor. The statute uses force, threat of force, fraud, coercion. So you're saying force is not defined in the statute. That's the definition the district court adopted. It is, Your Honor, unobjected to by the parties. Unobjected to, okay. What about physical threats? Were there physical threats here? There were both physical threats and physical violence. The case indicates that almost from the beginning, Jennifer Levnick was slapped harshly on the way from, I believe it was Maryland to South Carolina on her inaugural trip after she'd been recruited by the defendant because she disrespected the defendant. And shortly thereafter, beginning in South Carolina and then continuing in Little Rock, Arkansas, she learned pimp rules. She was physically beaten when she refused in Little Rock to go out and work truck stops. She was severely beaten and choked in an incident in Little Rock when she discovered the defendant with Courtney Mayberry because, again, remember the defendant had led her to believe that this was forever love. The defendant found her, I'm sorry, Ms. Olenek found the defendant with Ms. Mayberry, who had just been recruited by the defendant to be a pimp for him, and the defendant severely beat her backwards into a bathtub and left her lying there. There was also a beating in Augusta, Georgia, when the defendant returned from fanning his pimps out around a couple of state area and found her asleep when she was supposed to be making money for him prostituting. He beat her, including kicking her and doing damage to her ribs. Did any of the victims link their decision to engage in the commercial sex activity to his violent acts or his threats of violence? Yes, Your Honor. In particular, Jennifer Olenek indicated that she engaged in the work at the truck stops because of the physical chastisement, and there was a significant issue about her being forced to engage in anal sex, which she did not want to engage in because it really bothered her, and she was, again, forced into that by the physical violence or the threats of physical violence. I think the record is complete with references to that. Also, I think under the general heading, if you look at Sabra Addison, she is somewhat different from Jennifer Olenek or Courtney Mayberry or even the recruitment of Brittany Lawson, who we do not claim as a victim. She was the bottom bitch. Sabra Addison was virtually kidnapped, and so all of her acts, in essence, are based upon a physical act against her. In fact, when she was found in Omaha, Nebraska, the uncontested record is she was observed to be in a fetal position crying violently. She was clearly extremely traumatized by the fear of the defendant. In fact, mentioning that, the government would indicate as part of its response with regard to sentencing that the defense has conveniently chosen the wrong statutes for comparative purposes. Number one, that's even if you reach comparative purposes, because the government argues that under the state of the law, the statute is very clear to its coverage and what penalties apply within the statute, and therefore there is no need to do, in fact, that you should not do, a comparative analysis. What do you mean by comparative analysis? State statutes, you mean? State statutes or other federal statutes, Your Honor. Under state statutes, the comparable statutes would be kidnapping or sexual abuse resulting in serious physical injury, which carry penalties up to life. With regard to federal statutes, again, I would argue that a fair examination of the record with regard to Sabra Addison is comparable to kidnapping, which could carry penalties in these circumstances of up-to-life imprisonment. The defendant knew, though, with regard to particularly Jennifer Olevnik and Courtney Mayberry, the vulnerabilities of these people because he, again, became very intimate with them in this rapid succession from November of 2010 to January of 2011. And the record is clear. At this same time that he was engaging in dalliances for the purposes of having them be prostitutes for him with Jennifer Olevnik and then rapidly Courtney Mayberry and then rapidly Brittany Lawson, the defendant also had a wife and a child in another location that he wanted to go home to. So the government would argue that clearly this was a situation of fraud, intentional deceit, which is, again, the definition that was given in Instruction 20 was the term fraud means any deliberate act of deception, trickery, or misrepresentation. Courtney Mayberry is- Well, does this theory mean pretty much any prostitution case then? No, absolutely not, Your Honor. What's the limiting principle? Because I assume all pimps engage in some sort of psychological interaction with women. Actually, in this case, Your Honor, there was limited testimony that there may be such a thing, and this is my term and it is not a good term, as a benevolent pimp as opposed to a malevolent pimp, which the government argues this defendant is. Someone who does not necessarily use the psychological pressure, someone who does not necessarily use the physical coercion. So there may be a distinguishing factor. If there are no pimps out there that do not engage in these activities, then all pimps are covered by this statute. And the reason is is because it's slavery. And what happens is the law in 2000 in the TVPA, as the government argues in its brief, in reaction to a United States Supreme Court case where the United States Supreme Court actually encouraged Congress to act, said that where we are at in our society, we have to advance the conditions of slavery beyond physical slavery or an abusive law. We have to advance it to cover non-physical types of activities. So the law is very clear. There do not have to be chains. There do not have to be cages. Other things cause people to lose their will to be subjugated. And in this case, the defendant intentionally and knowingly took advantage of the vulnerability of two of the victims, Jennifer Levenick, who had a psychiatric history, a substance abuse history, definitely was looking for a male figure for love in her life, various factors that the government sets forth. But the fact is, not only did she have objectively these vulnerabilities, but the defendant got close to her, learned her vulnerabilities, and took advantage of them. Courtney Mayberry and Brittany Lawson described Jennifer Levenick separately as having the mind of a child. That was accurate. And the defendant took advantage of that. In that sense, there's no difference in terms of the subjugation of the will of the victim to taking minors across state lines to engage in prostitution. A woman with serious mental health problems with a mind of a child. With regard to Courtney Mayberry, there was a terrible history. She was only barely 18 at the time of this encounter with the defendant. Within the last four years of her life, she had been supporting herself by prostitution for a variety of reasons that were set forth briefly in the record. She engaged with the defendant because she wanted to have a pimp for purposes of security and stability. That was made extremely clear by her. The defendant got very close to her, as he did to Jennifer Levenick. He even went so far with her as to write poetry to her. Again, making the same promises that he made to Jennifer Levenick just months before. And so he got her to engage in commercial sex acts for him by the use of those false promises. And, again, this is detailed in the government's brief. And there's a significant record, although a short record with regard to those issues, to show her background, as the statute clearly sets forth as appropriate, to look at these things. And then, finally, Saber Addison. It's not an issue so much, although there is clearly non-physical coercion. There were clearly, I think, as one of the judges noted earlier, with regard to both Jennifer Levenick and Saber Addison, there were threats not only against those individuals themselves, but against their families, and specifically in each case against a young minor child that each of those women had. Also there was a threat, and this ties back to the idea also that this is just one pimp dragging three adult prostitutes across state lines. There were specific threats that if anything happened to the defendant, he had other people on the outside who could take care of the victims, their families, or the minor children. So even the defendant himself engaged in the broader concept of the conspiracy as part of the aspect of threat and control. Say, on the sentence, do you recall if anything the judge said about why the 360 months was warranted? I do, Your Honor. Could you refresh my memory? He indicated that the government argued for a two-level enhancement for vulnerable victim under the guidelines, which took the guideline application to life imprisonment. The judge found that, in fact, the conditions of vulnerable victim were met, including specifically that the defendant had to know of the vulnerabilities. But the judge felt that because the concept of vulnerable victim was tied up quite a bit in element three of sex trafficking, that even though he may not be required to, he would, in essence, offset the guideline range to a variance of two levels. That took it from life to 360 to life, and the court then imposed the bottom of the guideline. I understand that, but I mean, you know, Mr. Burns argued at some length in the pre-sentence report, or in the sentencing brief, and I think the pre-sentence writer indicated a little sympathy as well, that what's described in the congressional findings may be more elaborate than the evidence here. Did the judge have any response to that? No, Your Honor, but the government also counterbalanced that. Because the government sets forth in its brief a number of congressional findings that would go to other than international or large-scale organized events as constituting sex trafficking. I just mean, did the judge agree with that argument? He just didn't really comment on this. I don't think the judge had a lot of comment on that specifically. Okay, thank you. And, again, the government would argue we don't reach that analysis, and part of that is the Jungers or Youngers case that the government cited in its 28-J letter, which is a sex trafficking case out of South Dakota where the court has determined that, in fact, Johns or consumers of sex trafficking are subject to the sex trafficking statute and can be convicted just as the sellers. There's no limitation in any sense in the statute, and that case turns specifically upon an analysis of the plain language of the statute. So in terms of a statutory argument, the government would argue that the plain language of the statute does not limit the penalties of the statute to international sex trafficking. It wouldn't make sense. Why should Congress any more protect a person who is kidnapped in Venezuela, as is the defense example, and brought into this country for sex slavery than an American citizen who is kidnapped in this country and taken into sex slavery? Why should we protect any more? And we should protect those international people, but why should we protect any more of those people than we would people that are co-opted out of mental health institutes, are very susceptible to the fraudulent representation of many pimps, and because of that subjugated into the slavery of sex trafficking, which is one of the most intimate forms of abuse of a human being that can occur, is the sexual aspect of the human being. It takes away not only the body and the mind, but the spirit. So why should we? That's really the gravamen of this offense. That's why it's so serious. So, again, in terms of constitutional proportionality, I'd suggest that that's not an appropriate analysis that the defense has given, that on the plain language of the statute, this is a broad statute and it reaches the very essence of what it means to be a human being. That's what's being protected here. The closest analogy would be serious sexual abuse resulting in physical injury in a state case or kidnapping federally. Briefly to comment on Tiffany Addison, the government totally argues that the defendant did not know about Tiffany Addison other than from the discovery file. Tiffany Addison was in Louisiana, Texarkana, and the defendant drove her home in June of 2011, just weeks before they were arrested in Omaha. The defendant had intimate knowledge of Tiffany Addison and her relationship to this case long before the government's discovery file. Thank you. Thank you, Mr. O'Mara. Mr. Burns, may I conclude your argument? Thank you, Your Honor. What went on here was not kidnapping. In kidnapping cases, the kidnapper does not allow his victims to leave and come back whenever they want to. In kidnapping cases, individuals don't come back and join the fold after they've been gone for three months or two weeks or whatever. This isn't slavery. I noticed in the government's brief they cited a number of cases where they talked about the experience of the pre-Civil War slaves who would be allowed to go into town and do shopping and go back to their owners. It's a whole different set of circumstances today. In those days, had an individual gone into town and took off and not come back, the government would have brought them back. In this case, these women who were allowed to leave and come back whenever they wanted to, had they gone to law enforcement, had they not wanted to come back, the government would not have returned them to Mr. Bell. The government would have prosecuted Mr. Bell for whatever crimes he supposedly committed. Judge Colleton hit the nail on the head when Judge Colleton asked Mr. O'Mara, isn't this really inherent with all pimps and prostitutes? Isn't this inherent in the relationship? The answer to that question is yes. Mr. O'Mara tried to draw a connection or talk about benevolent versus malevolent pimps. There is evidence in the record actually from Brittany Lawson who talked about finally going back to Mr. Bell after trying out two other pimps because Mr. Bell was basically the best of all the pimps. If there is such a thing as a benevolent pimp, under the facts of this case, Mr. Bell is essentially the benevolent pimp. But the fact of the matter is that the controlling nature of the relationship, the aberrational violence, things like that are all inherent in prostitution cases. And if you want to characterize every prostitution case involving a single pimp and three adult prostitutes as sex trafficking, we're going to be charging people who were looking at a ticket before with offenses that are going to carry prison sentences of 30 years. Thank you, Mr. Burns. The court thanks both counsel for your argument this morning and the briefing which you submitted. We will take your case under advisement and render a decision in due course. Thank you. You may be excused. Madam Clerk, would you call Case No. 2 for the morning? Yes, Your Honor. The next case for argument is 13-2673 Eastern Arkansas, J. McDaniel Construction v. Mid-Continent Casualty Company, et al. Mr. Overstreet, when you're ready, you may proceed. Thank you, Your Honor.